## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                          No. CR 12-2686 JB

YUREN ARANDA-DAIZ,

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Yuren Aranda-Diaz's Motion to Suppress Evidence and Statements, filed May 24, 2013 (Doc. 37)("Motion to Suppress").   The Court held an evidentiary hearing on July 3, 2013.   The primary issues are: (i) whether the Court should suppress all evidence which was the fruit of Defendant Yuren Aranda-Diaz' arrest, which requires the Court to address whether the Albuquerque, New Mexico Police Department ("APD") officers who arrested him lacked probable cause to do so; and (ii) whether the Court should suppress all evidence that the APD found in its search of Aranda-Diaz' vehicle immediately after Aranda-Diaz' arrest, because there was no search warrant, which requires the Court to address whether the search was conducted under any exception to the Fourth Amendment to the United States Constitution's search warrant requirement.   The Court will deny the Motion to Suppress. The APD had probable cause to arrest Aranda-Diaz for heroin distribution, because a confidential informant ("CI") tipped the police that Aranda-Diaz distributed heroin, the CI's tip was credible and based on sufficient knowledge, and the controlled purchase of drugs based on the CI's tip, in which the CI purchased drugs through an intermediary, and which APD officers observed, corroborated the CI's tip.   The APD officers arrest of Aranda-Diaz for heroin distribution

provided the officers reasonable belief that Aranda-Diaz' vehicle might contain evidence relevant to the crime, and the officers' immediate search of Aranda-Diaz' vehicle was thus lawful under the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement.   The search of an area under Aranda-Diaz' vehicle's cup holder's in the center console was lawful, because Aranda-Diaz' arrest for heroin distribution and the officers' observations during the controlled purchase operation provided the officers with probable cause to believe that evidence relevant to the crime might be found in that area.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.   See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").   This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes.   The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.   See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'")(quoting United States v. Matlock, 415 U.S. 164, 174 (1974)).   In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.   See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.   In so deciding, the

court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)("We need not resolve whether Crawford[ v. Washington, 541 U.S. 36 (2004)]'s[1] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'");[2] United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."). Cf. United States v.

---

[1] Crawford v. Washington stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness. See 541 U.S. at 53-54.

[2] United States v. Garcia is an unpublished opinion, but the Court may rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266 (10th Cir. 2005). The Court finds that United States v. Garcia has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford

v. Washington does not apply to detention hearings").[3]

1.       On October 2, 2012, a CI contacted APD Detective Herman Martinez, Jr. and

advised Martinez that the CI knew a subject named "Jessie," later positively identified as Jessie

Lopez, who could assist police in obtaining large quantities of heroin.   See Criminal Complaint

for the States of New Mexico, County of Bernalillo Metropolitan Court at 1, filed in state court on

October 4, 2012( Defendant's Hearing Exhibit A)("Ex. A");  Transcript of Hearing at 62:16-18

(taken July 3, 2013)(Court)("Tr.")(admitting into evidence Defendant's Hearing Exhibit A);[4]  Tr.

at 13:13-14:7 (Walsh, Martinez)(Q: "October 2nd, 2012.   Tell us about the informant contacting

you."   A: "[T]he informant called me . . . and advised me that he knew a person that could help us

obtain a quantity of heroin . . . ."   Q: "[A] substantial amount?" A: "Yes."   Q: "What did the

informant say . . . about who could line up some heroin for him?"   A: "A friend of his by the name

_____

[3] The Defendants do not raise any arguments under Crawford v. Washington against any evidence in this case; the Court, therefore, need not decide whether Crawford v. Washington applies to suppression hearings.   The Court notes, however, that no court has held Crawford v. Washington applies to suppression hearings, and the courts that have decided the issue have found that Crawford v. Washington does not apply to suppression hearings.   See Ebert v. Gaetz, 610 F.3d 404, 414 (7th Cir. 2010)(right of confrontation does not apply at a suppression hearing); United States v. Garcia, 324 F. App'x. 705, 708 (10th Cir. 2009)(unpublished)("There is no binding precedent from the Supreme Court or this court concerning whether Crawford applies to pretrial suppression hearings.   To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia.").   Cf. United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007)("[W]e hold that Crawford v. Washington does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence.");  United States v. Saneaux, 365 F. Supp. 2d 493, 498 n.5 (S.D.N.Y. 2005)(concluding that Crawford v. Washington does not apply to determining whether a statement is admissible under the coconspirators hearsay exception: "[B]ecause the Court is not bound by the Rules of Evidence in the disposition of preliminary matters such as this one, I may properly consider such evidence even if it cannot be introduced at trial.").

[4] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and line numbers.

- 4 -

of Jessie . . . turned out later to be Jessie Lopez.").

2.      The CI, who was aware that Lopez knew a person called "Oso," later identified as Aranda-Diaz, contacted Lopez.   Tr. at 15:5-15 (Walsh, Martinez)(A: "[T]he CI received a phone call from Jessie . . . and Jessie was pretty much was telling the CI that he needed to hurry because his [contact] was ready and was kind of pushing the deal forward."   Q: "And who was this connect identified as at this point?"   A: "At that point the only name that I had was the name of Oso.").

3.      Lopez stated that Aranda-Diaz was selling heroin for $750.00 an ounce.      See Tr. at 14:16-20 (Martinez)(noting that the CI "advised me that he knew a person by the name of Jessie . . . and that this person knew another subject who could deliver the heroin for the price of $750 [per ounce].").

4.      Martinez then made arrangements with the CI for the purchase of an ounce of heroin from Aranda-Diaz, through Lopez, which Martinez heard over the CI's speakerphone. See Tr. at 15:5-11 (Martinez)("[T]he CI received a phone call from Jessie . . . [,] the CI put the phone on speaker . . . and Jessie pretty much was telling the CI that he needed to hurry because his connect was ready and was kind of pushing the deal forward.").

5.      Before the start of the operation, Martinez inspected, for any controlled substances and United States currency, the vehicle that the CI and Lopez intended to use in the transaction, and photocopied the $750.00 in United States currency -- the "buy money" -- to be used to purchase the heroin from Aranda-Diaz.   Tr. at 16:5-8 (Martinez)("At that point . . . . Sergeant Stout provided me with buy money that I had photo[copied] prior to the start of the operation."). See Ex. A at 1 ("I searched the CI and IT's vehicle for any controlled substances and U.S. currency

- 5 -

and found none."); Tr. at 15:16-20 (Walsh, Martinez)(Q: "[H]ad you searched the informant . . . ?" A: "[S]oon after th[e] [CI's] conversation [with Jessie] at that point I searched the CI, his person, and his vehicle to ensure it didn't have drugs or currency in its possession, and it did not.").

6.     Martinez provided the CI with the buy money before the CI drove the inspected vehicle to Lopez' apartment, located north of Carlisle and Montgomery, NE, in Albuquerque, where the CI retrieved Lopez for the transaction.   See Tr. at 16:8-10 (Martinez)("The buy money was then given to the CI.   At that point the CI drove north on Carlisle toward the apartment complex."); Tr. at 14:16-20 (Martinez)("Jessie . . . resided at the area of Carlisle and Montgomery . . . ."); Ex. A at 1 ("I then provided the CI with $750.00 of U.S. Currency that I had photocopied prior to the start of the operation.").

7.     After the CI retrieved Lopez from his apartment, the CI and Lopez drove to the area of 5th and Menaul, NW in Albuquerque and parked in a residential neighborhood.   See Tr. at 18:18-19:7 (Martinez)("[W]hen the CI arrives at Mr. Lopez's apartment, Mr. Lopez gets into the vehicle and they immediately drive away. . . .   as the CI waited for the light to cycle at the Montgomery I received a text it said [4th] and [M]enaul . . . ."); Tr. at 19:15-16 (Walsh, Martinez)(Q: "Is it [4th] and Menaul or [5th] and Menaul?" A: "Eventually they [drove to] [5th] and [M]enaul.").

8.     Martinez and APD Detective Irwin followed the CI to Lopez' apartment, and then into the residential neighborhood of 5th and Menaul.   See Tr. at 16:15-16 (Martinez)("I'm following -- following the CI along with Detective Irwin."); id. at 19:10-14 (Martinez)("[We] keep a loose follow on the CI's vehicle [after it leaves Lopez' apartment complex].").

9.     At approximately 2:30 p.m., the detectives observed a blue Chevrolet Suburban

pull into a driveway located at 2705 5th Street NW.   See Tr. at 20:24-21:3 (Martinez) ("I heard [S]ergeant Ficke advise that he was on [5th] Street, that he had seen a . . . Chevrolet Suburban parked, and that another vehicle pulled behind that vehicle and one of the occupants of the unknown vehicle chad gone to the Chevy Suburban.").

10.    APD Sergeant Ficke, over the radio, informed the other officers that a vehicle -- other than the CI's vehicle -- pulled up behind the Suburban, that one of the vehicle's occupants got into the Suburban, and after a few moments, got back into the vehicle and drove away.   See Tr. at 20:24-21:18 (Martinez, Walsh)("[S]ergeant Ficke advise[d] that . . . he had seen a [Chevy] suburban parked, and that another vehicle pulled behind that vehicle and one of the occupants of the unknown vehicle had gone to the Chevy Suburban. . . . [T]he person from the unknown car gets back into his car and drives away . . . .").

11.    Sergeant Ficke believed that another drug transaction was occurring between Aranda-Diaz and the person from the unknown vehicle.   See Tr. at 21:4-6 (Martinez)("[S]ergeant [Ficke said] based on his training and experience he believed that another drug transaction was occurring.").

12.    After the unknown car drove away, Ficke observed Lopez exit the CI's vehicle, walk directly to the Suburban, and enter the vehicle on the passenger side.   See Tr. at 21:15-21 (Martinez) ("After the person from the unknown car gets back into his car and drives away, [Sergeant Ficke] advises me that . . . Jessie Lopez . . . was exiting the CI's car and walking toward the Suburban.").

13.    The CI advised police that the CI had provided Lopez with the buy money to purchase the heroin.   See Tr. at 22:2-4 (Martinez)("At that point I received a phone call from the

- 7 -

CI.  The CI advised me that I had given Jessie the money and that he was going to go get the drugs.").

14.     Police then observed Lopez exit Aranda-Diaz' Suburban and walk back to the CI's vehicle.  See Tr. at 22:9-12 (Martinez)("Sergeant Ficke observes the unwitting informant Jessie exit the vehicle belonging to the defendant or driven by the defendant and walk back to the CI's car and enter again.").

15.     Once Lopez returned to the CI's vehicle, the CI provided to the detectives the agreed-upon signal, which indicated that Lopez had purchased the heroin from Aranda-Diaz, and then the CI sent a text message to Martinez stating that the CI had the heroin in the CI's possession. See Tr. at 22:12-20 (Martinez)("At that point Sergeant Ficke observes the CI remove his hat, indicating that it sees narcotics.   At that point the CI's vehicle drives away . . . . [a]nd during that [time] follow[ing the CI's car] the CI texted me indicating that it had narcotics.").

16.     A pre-determined arrest signal was then given to members of the APD's East and Westside Narcotics Units, and APD detectives approached Aranda-Diaz' vehicle, where he was arrested and placed in custody.  See Tr. at 23:21-24:1 (Martinez)("After sergeant Ficke saw the nonverbal signal . . . of the CI removing his hat and also receiving confirmation from myself via the handheld radio that narcotics had been purchased, an . . . arrest was conducted by the east side and west side narcotics unit.").

17.     With APD detectives following, the CI returned Lopez to his apartment and then met with the detectives at a pre-determined location.   See Tr. at 22:14-20 (Martinez) (""My role at this point was to follow the CI and Jessie back to the apartment on Montgomery, and I did that. . . ."); id. at 24:23-25:2 (Martinez)("I followed the CI to Mr. Lopez's residence.   Mr. Lopez exited

the car went back into his apartment.   I then met the CI at a[] predetermined location, which in this instance was the Lota Burger which is at Carlisle and Montgomery just east.").

18.     Once at that location, the CI gave detectives a plastic baggy that contained a black tar substance -- approximately 36.9 grams -- which later field-tested positive for the possession of heroin.   See Tr. at 25:2-8 (Martinez)("Once at the Lota Burger I was given by the CI the heroin that was sold to Mr. Lopez and subsequently given to the CI. . . .   I later did conduct a field test of this substance and it tested positive for the presence of heroin."); Ex. A at 1 ("Once at the location the CI handed me a plastic baggy that contained a black tar substance (approximately 36.9 grams). It later field tested positive for the presence of Heroin.").

19.     Police again searched the CI and the CI's vehicle for any controlled substances and found none.   See Tr. at 10:13-23 (Walsh, Martinez)(testifying that officers search the CI "prior to and after [the bust] . . . .   [I]t's done after, basically to make sure that the CI did not take any drugs," and stating "that's what happened on this case"); Ex. A at 1 ("I again searched the CI . . . vehicle for any controlled substances and U.S. currency and found none.").

20.     The CI was then released.   See Ex. A at 1 ("The CI was released.").

21.     Based on his training and experience, short encounters between people that are possibly selling narcotics indicates that a drug transaction occurred.   See Tr. at 58:6-15 (Walsh, Martinez)(Q: "Now, detective, when someone enters a car or a house for a short period of time and leaves, what could that mean in your world?"   A: "Based on my training and experience, short [encounters] with subjects that are possibly selling narcotics, that's an indication to me that it's a narcotics deal." Q: "And why is that?"   A: "Because usually the encounters are brief, the exchange is quick, and that's basically done because in fear of not wanting to be in an area where it

draws attention to yourself.").

22.     At the scene, after the CI and Lopez drove away, Aranda-Diaz got out and knocked on the door at 2705 5th Street NW, and when no one answered, he returned to the Suburban.   See Tr. at 26:6-12 (Martinez)("[T]he defendant exit[ed] the vehicle, walk[ed] to the front door, knock[ed] on the door.   The door was not answered . . . and the defendant walked back to his vehicle.").

23.     When Ficke saw Aranda-Diaz put the Suburban in reverse, Ficke called for the officers on the scene to maneuver behind the Suburban and block it into the driveway.   See Tr. 26:12-15 (Martinez)("[Ficke] [ob]served the vehicle be placed . . . in reverse and at that time he called a block, which is a blocking maneuver utilized by detectives to block a vehicle in place to prevent a vehicle pursuit.").

24.     Officers around the residence, from both the APD's East and Westside Narcotics Units blocked in the Suburban, and took up positions to remove Aranda-Diaz from the Suburban. See Tr. at 27:16-18 (Martinez)("They went toward the defendant's vehicle, blocked it in place and exited its vehicle and took up positions to extract him from the vehicle.").

25.     Immediately after blocking in the Suburban, the officers arrested Aranda-Diaz.   See Tr. at 27:23-28:1 (Martinez)("The arrest was made immediately after [the block] as a result Ficke gave the orders . . . .").

26.     Thirty to forty-five seconds after Ficke gave the order to arrest Aranda-Diaz, APD Detective Glen Stout arrived at the scene, found the driver's side door open, and saw a small-caliber handgun on the right side of the driver's seat.   See Tr. at 68:18-69:6 (Stout, Walsh)(Q: "How long did it take you to get to the arrest scene?"   A: "I'd say less than a minute.

- 10 -

30, 45 second[s]." Q: "What did you do once you arrived there?"   A: "Once I arrive there, got out of my vehicle, walked up to the defendant's vehicle, . . . the driver's door was standing open, and from there I could see a small caliber handgun on the right side of the driver's seat.").

27.     At that time, officers were escorting Aranda-Diaz back to a police cruiser parked in the street, and he was about fifteen to twenty feet behind the Suburban.   See 69:8-23 (Stout)("As I was walking up he was being walked back away from the vehicle into the street.   I guess back to a unit to be transported. . . .   [H]e was 15, 20 feet behind his vehicle.").

28.     Detectives conducted a search of Aranda-Diaz' person and vehicle.   See Tr. at 70:20-24 (Stout)("Based on the . . . arrest, I began conducting a search of the vehicle -- a search subsequent to the arrest but also an inventory search of the vehicle to document any valuables in the vehicle . . . per city policy.").

29.     The search of Aranda-Diaz' person revealed that Aranda-Diaz had the $750.00 of APD buy money concealed in the stock.   See Tr. at 72:8-17 (Walsh, Stout)("I took possession of the firearm, the narcotics and the scale. . . . [a]s well as the buy money, which . . . . I was told that it was taken from the defendant's sock . . . .").

30.     This money was verified by comparing its serial numbers in the serial numbers against the photocopy of the buy money made before the start of the operation.   See Ex. A at 1 ("Detective Saladin located $750.00 of department buy money concealed in Aranda's sock.   This money was verified by its serial numbers from those on the photocopy made prior to the start of the operation.").

31.     Stout searched the Suburban, both for purposes of a search incident to arrest "but also an[] inventory search of the vehicle to document any valuables in the vehicle."   Tr. at

70:20-24 (Stout)("Based on, you know, the arrest, I began conducting a search of the vehicle both to -- a search subsequent to the arrest but also an[] inventory search of the vehicle to document any valuables in the vehicle for subsequent tow per the city [policy].").

32.     The inventory search was pursuant to the APD's or the City of Albuquerque's policy.   See Tr. at 70:20-24 (Stout)("Based on, you know, the arrest, I began conducting a search of the vehicle both to -- a search subsequent to the arrest but also an[] inventory search of the vehicle to document any valuables in the vehicle for subsequent tow per the city [policy].").

33.     During the search of the vehicle, and before having it towed, police located a loaded .32 caliber Beretta on the driver's seat, and also located a digital scale and a concealed pill bottle in the vehicle's center console.   See Tr. at 69:1-6 (Stout)("Once I arrived [at the scene after Aranda-Diaz was in police custody], got out of my vehicle, . . . walked up the defendant's vehicle, . . . the driver's door was . . . standing open, and from there I could see a small caliber handgun on the right side of the driver's seat."); id. at 71:1-5 (Stout)("In the center console area there's a cup holder . . . . It was loose.   I pulled it up and under . . . there was a small . . . brown prescription bottle . . . ."); id. at 80:21-23 (Coberly, Stout)(Mr. Coberly points to Defendant's Hearing Exhibit E-2, the photograph of the console, and asks Sergeant Stout: "So this is the area where you located the pill bottles and the scale?"   A: "I believe so, yes."); id. at 78:5-6 (admitting Defendant's Hearing Exhibit E-1 into evidence); id. at 80:18-20(admitting Defendant's Hearing Exhibit E-2 into evidence); Defendant's Hearing Exhibit E-1 (photograph of gun on the Chevrolet Suburban' driver seat that Officer Lam Paris-Tremba took at the scene); Defendant's Hearing Exhibit E-2 (photograph of the Chevrolet Suburban's center console).

34.     Stout noticed that, in the center console area, there was "a cup holder that seemed

loose," so he pulled out the center console to reveal an open area.   Tr. at 71:1-4 (Stout)("In the center console area there's a cup holder that seemed loose.   It's a kind of a square area.   It was loose.   I pulled up on it and under there is kind of a natural void in the vehicle . . . ."). <u>See</u> Defendant's Hearing Exhibit E-1.

35.   Stout looked in the center console, because he has found narcotics in vehicles' center consoles before and, in his experience as a narcotics officer, "folks like to hide things in that area.   It's a natural area where there's a void, and in most vehicles the cup holders come out to . . . facilitate cleaning them . . . ."   Tr. at 71:20-25 (Stout).

36.   The pill bottle contained five individually wrapped plastic bags, each of which contained a black tar substance.   <u>See</u> Tr. at 71:9-14 (Walsh, Stout)(Q: "What was inside the . . . prescription pill bottle?"   A: "It appeared to be black tar heroin."   Q: "And was it packaged a particular way?"   A: "As I recall it was individually yeah individually packaged."   Q: "I want to say four or five [baggies] of heroin.").

37.   The total approximate weight of the five bags was 18.4 grams.   <u>See</u> Ex. A at 1 (noting that the pill box "contained 5 individually wrapped plastic bags that contained a black tar substance (approximate total weight 18.4 grams)").

38.   The black tar substance in the bags later field-tested for the presence of heroin. <u>See</u> Ex. A at 1 (noting that the 18.4 grams of substance found in the baggies "later field-tested positive for the presence of heroin.").

39.   Martinez noted that the amount of heroin that Aranda-Diaz sold for $750 was a substantial amount, that he was higher-up dealer, and that the amount Aranda-Diaz possessed was "far in excess of user amounts and were amounts typical of a mid-level drug dealer."   Ex. A at 1.

See Tr. at 13:21-14:3 (Walsh, Martinez)(Martinez stating that the amount of heroin a person can purchase for $750 "varies on the dealer" and that the amount Aranda-Diaz sold to Lopez is "a substantial amount").

40.    When Aranda-Diaz was later taken into federal law-enforcement custody, he stated that he was a citizen of Mexico, that he had been deported from the United States on three previous occasions, and that he had previous felony convictions, including being a felon in possession.. See Tr. at 87:1-13 (Walsh, Arellano)(Q: "Did you have any idea as to why you were transporting [Aranda-Diaz] or what . . . his case was all about?"  A: "I understood he was some sort of prohibited person, but I [did] not understand the facts of [his] case."  Q: "And what, if anything, did the defendant say about being illegally here in the country at any time?"  A: "I wasn't sure what type of prohibited person he was . . . , but he did make a mention that . . . prior I think he had a felon in possession charge that he had just gotten out of prison for.   Also mentioned that he was a prior deport.").

## PROCEDURAL BACKGROUND

On October 23, 2012, the United States charged Aranda-Diaz with six federal crimes, including: (i) Count 1: a violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), alien in possession of a firearm and ammunition; (ii) Count 2: a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), felon in possession of a firearm and ammunition; (iii) Count 3: a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), possession with intent to distribute heroin; (iv) Count 4: a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), distribution of heroin; (v) Count 5: a violation of 18 U.S.C. § 924(c), possession and carrying a firearm during and in relation to a drug trafficking crime; and (vi) Count 6: a violation of 8 U.S.C. §§ 1326(a) and (b), reentry of a removed alien.   See

Indictment, filed October 23, 2013 (Doc. 13).

On May 24, 2013, Aranda-Diaz filed his motion to suppress.  Aranda-Diaz moves the Court, under the Fourth and Fifth Amendments to the United States Constitution, to suppress all evidence recovered during the search of his vehicle and all statements that he made.  See Motion to Suppress at 1.  Aranda-Diaz argues that his arrest "for distribution of a controlled substance was not supported by probable cause," and that the Court should therefore suppress "all evidence recovered from the search of Mr. Aranda-Diaz's vehicle subsequent to his arrest,"  as well as his statements, as fruit of the poisonous tree.  Motion to Suppress at 1.  Aranda-Diaz also contends that, "[e]ven if the Court determines that Mr. Aranda-Diaz's arrest was lawful, the evidence recovered from the vehicle should still be suppressed because the search of the vehicle was nevertheless contrary to the Fourth Amendment."  Motion to Suppress at 1.

Aranda-Diaz asserts that probable cause did not support his arrest and the subsequent vehicle, because, while the facts that the officers knew at the time that they arrested him "might, at best, suffice to establish reasonable suspicion that Mr. Aranda-Diaz had distributed a controlled substance to 'Jessie,' they come nowhere close to establishing probable cause."  Motion to Suppress at 5.  Aranda-Diaz contends that the facts are lacking to support probable cause for two reasons.  First, the officers had not field-tested the substance that the CI provided Martinez until after Aranda-Diaz' arrest.  Second "is the fact that 'Jessie' was unknown to the officers and the officers had no information regarding 'Jessie's' veracity and reliability."  Motion to Suppress at 6.  Aranda-Diaz cites the Tenth Circuit's decision in United States v. Artez, 389 F.3d 1106, 1112 (10th Cir. 2004), for the proposition that "the use of an unwitting informant introduces an additional layer of uncertainty to the transaction because it leaves open the possibility that the

narcotics were acquired not at the suspect location but at the location where the confidential and unwitting informants met before and after the transaction." Motion to Suppress at 6 (internal quotation marks omitted). He concedes that the Tenth Circuit found probable cause in United States v. Artez notwithstanding the unwitting informant's use, but contends that "the lack of field testing (or even observation) of the substance obtained during the controlled buy, combined with the absence of corroborating factors as discussed in Artez sets this case apart."[5] Motion to Suppress at 7.

Aranda-Diaz argues that, because his arrest was unlawful, the Court should suppress all statements he made to officers following his arrest. See Motion to Suppress at 7-8. He points out that one factor which courts consider when deciding whether the evidence is free of illegal taint is the temporal proximity of the statements to the arrest. Aranda-Diaz asserts that this factor is dispositive, because he "provided his first statement less than three hours, and his second statement less than four hours, after his arrest." Motion to Suppress at 8.

Aranda Diaz argues that, even if the Court finds his arrest was lawful, the Court should exclude the evidence that the officers found searching his Suburban for two reasons:

> First, officers unlawfully searched the Suburban because it was unreasonable for them to believe that they would find evidence relevant to Mr. Aranda-Diaz's crime of arrest inside. Second, assuming *arguendo* that officers reasonably believed they would find evidence relevant to Mr. Aranda-Diaz's crime of arrest, it was unreasonable for them to dismantle Mr. Aranda-Diaz's vehicle in search of that evidence.

Motion to Suppress at 8. He argues that the officers could not reasonably have believed "that the

---

[5] An unwitting informant is an intermediary who is unwittingly passing along information to law enforcement either a through a confidential informant of an undercover agent. See Dennis G. Fitzgerald, Informants and Undercover Investigations: A Practical Guide to Law, Policy, and Procedure § 2.13, at 36 (2007).

- 16 -

Suburban contained additional evidence of that crime because 'Jessie' allegedly had arranged to purchase, and allegedly did purchase, the one ounce of heroin" that the officers believed Aranda-Diaz possessed, and because the "officers did not have any evidence that 'Oso' was involved in drug trafficking beyond the sale to 'Jessie.'"   Motion to Suppress at 9 (citing United States v. Hinson, 585 F.3d 1328, 1334-35 (10th Cir. 2009)).   With respect to the search inside the vehicle's console, Aranda-Diaz asserts: "In this case, even assuming Stout could have legally searched the Suburban's passenger compartment and any containers found therein pursuant to[Arizona v. Gant, 556 U.S. 332 (2009)], he could not lawfully dismantle the vehicle's console absent independently-derived probable cause, which he did not possess."   Motion to Suppress at 10.

On June 7, 2013, Plaintiff United States of America filed the United States' Response to Defendant's Motion to Suppress Evidence and Statements (Doc. 37).   See Doc. 42 ("Response"). The United States asserts that the officers "had both reasonable suspicion and probable cause to detain and arrest the Defendant."   Response at 7.   The United States asserts that probable cause developed when the facts aligned with and confirmed the CI's information given to Martinez. The United States points out that the CI contacted Martinez and informed him that Lopez, the unwitting informant, could coordinate purchasing heroin from "Oso," and that the events which unfolded on October 2, 2012 confirmed these facts.   See Response at 7.   The facts surrounding the arrest, and that they unfolded as the CI said they would, and the way that Martinez believed they would, "establish[] both reasonable suspicion and probable cause to arrest and [was] exactly the kind of scenario where deference should be given to law enforcement's experience." Response at 8 (citing Ornelas v. United States, 517 U.S. 690, 700 (1996)).   The United States

asserts: "There is . . . no requirement that narcotics must be viewed and tested before there is probable cause is developed.   In fact, courts have found probable cause in drug investigations even where the arrestees were not suspected of selling the narcotics themselves."   Response at 8 (citing States v. Soto, 375 F.3d 1219, 1222-1223 (10th Cir. 2004); United States v. Joy, 2009 WL 1918977, at ** 2-4 (4th Cir. 2009)).

The United States argues that the vehicle search was justified as an inventory search and thus constitutional apart from the lawfulness of Aranda-Diaz' arrest, or reasonable suspicion or probable cause that further evidence would be found therein, because Aranda-Diaz was the vehicle's sole occupant and did not reside at the location from which the vehicle was seized.   See Response at 8.   The United States also asserts that the search was justified under the "automobile exception," because law enforcement had probable cause to believe that there were evidentiary remnants of the drug transaction, and probable cause to believe that a gun may be located inside. Response at 8.   Additionally, the United States contends that probable cause existed to believe that "additional narcotics and trafficking paraphernalia" would be found in the vehicle search, because "there is probable cause to believe that not every dealer will sell his narcotics in one lump sum and will possess remaining packaged narcotics intended for distribution after the transaction," and also probable cause to believe that they would find the buy money on him -- which they did. See Response at 8.   Finally, the United States argues that the search was also lawful as a search incident to arrest:

> Though the Court need not reach the issue since the search was lawful on other grounds, the search of the defendant's vehicle may have additionally been justified nonetheless as a search incident to arrest, especially since the defendant was arrested for selling narcotics. The search incident to an arrest analysis will hinge on when the search was conducted in relation to where the defendant was taken into custody. As previously stated, there was probable cause for an arrest and a lawful

- 18 -

search of the vehicle.

Response at 9-10.   The United States adds that, "assuming arguendo, that the Court were to find

otherwise, the United States would argue that intervening circumstances and the lack of flagrant

misconduct should preclude the application of the exclusionary rule."   Response at 10.

On June 24, 2013, Aranda-Diaz filed his Reply to Government's Response to Defendant

Yuren Aranda-Diaz's Motion to Suppress Evidence and Statements.   See Doc. 44 ("Reply").   In

response to the United States' contention that the officers had both reasonable suspicion and

probable cause to detain and arrest him, Aranda-Diaz argues that "whatever the Government has to

say about the existence of reasonable suspicion to temporarily detain Mr. Aranda-Diaz is

irrelevant."   Reply at 1.   Aranda-Diaz asserts that the United States concedes that it never

performed an investigatory detention of him, because the United States states in its Response that

the officers immediately arrested him upon seeing the prearranged arrest signal.   See Reply at 1-2.

Aranda-Diaz asserts that the proper analysis is to look at whether the officers had probable cause

under the two-pronged confidential-informant analysis -- looking at whether the tip is credible and

then whether an officer's independent investigative work aids the credibility.   He asserts that the

conduct in this case fell short of providing probable cause to the officers under that analysis.   See

Reply at 2 (citing Illinois v. Gates, 462 U.S. 213, 234 (1983)).   Aranda-Diaz argues that, because

the police officers had not worked with Lopez before this incident, the information that he

provided to the CI could not have been considered credible.   Moreover, because the CI did not

observe the drug transaction between Aranda-Diaz and Lopez, the officers did not have probable

cause for Aranda-Diaz' arrest.   See Reply at 2.   He contends that, while the officers may have

overcome this lack in probable cause by corroborating the alleged transaction before Aranda-Diaz'

arrest, they did not do so, and his arrest was therefore unlawful.   See Reply at 3.   Aranda-Diaz contends that the United States misconstrues this argument in his Motion to Suppress where it asserts in the Response that Aranda-Diaz is arguing that there is a requirement that the officers view and test the alleged drugs before an arrest.   See Reply at 3.   He asserts that his argument is not that there is a broad requirement, but that it was required in this case, because the officers were unfamiliar with Lopez.   See Reply at 3.

In response to the United States' argument that the vehicle's search was permissible as an inventory search, Aranda-Diaz argues that the search cannot be based on an inventory search, because "[w]ithout a lawful arrest of Mr. Aranda-Diaz, officers would have had no authority to conduct an inventory search."   Reply at 4.   Aranda-Diaz further contends that, even if the arrest was lawful, the search of the center console cannot be justified on the basis that it was an inventory search, because "no valid administrative purpose could justify an official dismantling a portion of a vehicle to inventory its contents.   Rather, such a search can only be explained as a search for inculpatory evidence."   Reply at 4 (citing United States v. Walker, 81 F. App'x 294, 207 (10th Cir. 2003)(unpublished)).   Aranda-Diaz argues that the search-incident-to-arrest exception fails to support the officers' search of the Suburban for the same reason that the officers did not have probable cause to arrest him.   See Reply at 5.   He concedes that, if the Court concludes that there was probable cause for his arrest, the search of the inside of the car and discovery of the firearm are then lawful, but contends that the further search of the compartment under the cup holders was unlawful.   See Reply at 5.

At the evidentiary hearing, Aranda Diaz argued that "there's really two issues here.   The main one, of course, being the initial seizure [was] illegal and then the sort of subset of that is[,]

well[,] even if so was at least part of the search illegal?"   Tr. at 96:5-8 (Coberly).   He asserted

that the main argument with regard to probable cause is that the officers did not have "reasonably

trustworthy information [to] warrant a man of reasonable caution in believing that an offense had

been committed."   Tr. at 96:12-15 (Coberly).   The Court asked Aranda-Diaz whether the

weakest point in the United States' case for probable cause is the CI, to which he responded that

the weakest point is the CI, because the officers based their arrest on information the CI provided

to Martinez, which the CI obtained from Lopez, who was not a CI.   See Tr. at 96:22-97:8

(Coberly).   The Court inquired whether the corroborating evidence, including that Lopez was at

the apartment as the CI said, and that the Suburban showed up to transact with Lopez, was enough

to provide probable cause.   See 97:13-17 (Court).   Aranda-Diaz responded that he "think[s] it is

an issue," but asserted that doubt comes in when no one knows any of the conversation or conduct

between the CI and Lopez during the drive from Lopez' apartment to 5th Street and Menaul.   Tr.

at 97:18-25 (Coberly).   He asserted that, "when the Court goes back and looks at the most recent

cases pertaining to seizures, arrests without a warrant, there's always . . . some more

corroboration."   Tr. at 98:17-21 (Coberly).   Aranda-Diaz stated that, in the precedential cases,

the additional corroboration took the form of additional surveillance of the alleged drug dealer or

field-testing the substances before arresting the individual.   Here, there was no "other follow-up

that was specific to Mr. Aranda-Diaz.   It's you know all you have is the unwitting informant being

the intermediary."   Tr. at 98:22-99:14 (Coberly).   He asserted that "you've got Jessie, who

Detective Martinez knows nothing about[,] talking with a CI who he's only worked with twice . . .

before.   Assuming the CI is truthful [and] reliable that's fine[,] but there's no -- there's no

evidence as to Jessie's reliability, veracity[,] or basis of knowledge. . . ."   Tr. at 100:19-24

(Coberly).   In response to the Court's inquiry whether he concedes the officers had reasonable

suspicion, Aranda-Diaz responded that he concedes there was reasonable suspicion.   See Tr. at

101:8-10 (Court, Coberly).

In relation to the vehicle search, Aranda-Diaz asserted that "the law is clear that to conduct

an inventory search there . . . [must be] an administrative purpose, it's to protect property.   And to

start dismantling a vehicle[,] removing parts of a vehicle is not consistent with conducting an

inventory search."   Tr. at 102:5-12 (Coberly).   The Court asked what conduct Aranda-Diaz

considers dismantling the vehicle.   See Tr. at 102:13-14 (Court).   Aranda-Diaz referred the Court

to the Defendant's Hearing Exhibit E-1, and asserted that "it's basically a piece of plastic that sets

within the larger area of the console, and it snaps in there, and what happened is the officer

removed that to reveal this interior space."   Tr. at 102:17-21 (Coberly).   Aranda-Diaz, referring

to Defendant's Hearing Exhibit E-1, explained how the officers removed the top section of the

center console and asserted that it went beyond a permissible inventory search:

> They pulled out you can see here the line.   It's where the two components
> come together.   My understanding of the way this works is you can take your
> hands and on either side like where the Marlboro cigarette is and over here and pull
> out and pop it up.   It's just the way the car is designed that it's pieced together.
> It's manufactured that way.
>
> And when that happens it reveals this, which is I meaning it's clearly not a
> component designed to store stuff in.   It's just the way the car is manufactured.
> You've got the electronic wiring and stuff like that.   And you can see these tabs
> here which are the areas where you like pop this whole section out, and that's where
> the contraband was found, was down in this area.
>
> So . . . I mean an inventory search is not going to allow that.

Tr. at 104:12-105:2 (Coberly).   Aranda-Diaz also argued that the search cannot be justified as a

search incident to arrest, because there was no officer safety issue, as Aranda-Diaz was already

handcuffed, and because, even if there is a reasonable expectation of finding additional evidence in the vehicle, an officer cannot "start taking apart the manufactured components of the vehicle." Tr. at 105:10-106:1 (Coberly).

The United States argued that there was probable cause to arrest Aranda-Diaz when the officers did so, because APD had used this particular CI twice before this instance and because Martinez testified credibly that, based on over twenty-five years of experience performing similar bust-buy operations, he found the CI's information reliable.   See Tr. at 106:18-24 (Walsh).   The Court asked the United States whether, when the CI arranged the details of the transaction with Lopez, Martinez was listening to the conversation.   See Tr. at 106:25-107:2 (Court).   The United States responded that he was.   See Tr. at 107:3-7 (Walsh).   The United States asserted that the totality of the circumstances show that there was probable cause, as the events unfolded exactly how that conversation related they would, and then Finke personally observed the intermediary get out of the CI's car, get into the alleged drug dealer's car, and then return to the CI's car, followed by the CI giving the prearranged arrest signal.   See Tr. at 107:22-108:11 (Walsh).   The United States added that, as a secondary argument, "even given the circumstances the[ officers] probably had reasonable suspicion to detain and then when they saw the firearm that's yet further evidence that if they didn't have probable cause there that kind of elevates things to the probable cause level that, indeed, a transaction just occurred."   Tr. at 109:6-11 (Walsh).

The United States added that the collective-knowledge doctrine "is obviously at play here in terms of communications and who's seeing what" for probable cause.   Tr. at 109:13-16 (Walsh).   The United States added that, in relation to the search of the Suburban, while the vehicle inventory search is sufficient to justify the search,

> what looms large that justifies a search is the automobile exception [to] probable cause.   The officers saw a deal go down.   That was the whole plan . . .   [T]hey have probable cause to think that there's evidence of [the] . . . remnants of a drug deal inside the vehicle.   Low and behold they turn out to be right.   There's a loaded firearm sitting in the driver's seat.   And they also have probable cause to believe that there may be additional narcotics.   It's reasonable to believe that not every dealer is going to sell their whole lump of product during one transaction. . . .

Tr. at 109:24-110:4 (Walsh).   The United States added that the officer-safety exception also fits, because the events took place in such a quick sequence that seeing the gun on the driver's seat implicated officer safety.   See Tr. at 110:13-20 (Walsh).   The United States asserted that, even if the automobile exception did   not provide probable cause to search the console before the officers found the gun on the driver's seat, once they did, they had probable cause to search the console. See Tr. at 111:2-5 (Walsh).

Aranda-Diaz asserted that the Supreme Court of the United States' decision in Illinois v. Gaits supports his position that there was not probable cause, because the informant in that case saw the transaction, whereas the CI here did not witness the transaction.   See Tr. at 112:7-19 (Coberly).   The Court asked Aranda-Diaz whether he believes the transcript will reflect that Martinez listened to the CI arrange the transaction with Lopez.   See Tr. at 112:20-22 (Court). When Aranda-Diaz responded that he remembered that Martinez was listening to the conversation over the speakerphone, the Court asked whether, considering the transaction played out as arranged, that is sufficient to make him a first-hand witness to the transaction.   See Tr. at 112:23-113:8 (Coberly, Court).   Aranda-Diaz responded that he "admit[s] that fact cuts against me but we have to look at the totality of the circumstances . . . and I go back to they knew nothing about Jessie."   Tr. at 113:9-12 (Coberly).   He asserted:

> My argument is that if you're going to have an [unwitting informant,] that adds uncertainty[,] then you need to revise your standard protocols in moving forward

for the investigation and do at least some more investigative follow-up work to make sure that, yes, in fact, a drug transaction did occur before arresting someone off the [street] who you know nothing about.

Tr. at 114:13-18 (Coberly).

In regards to the United States' argument that, because the officers had reasonable suspicion, they would have had probable cause when they asked Aranda-Diaz to get out of the vehicle and saw the gun on the driver's seat, Aranda-Diaz asserted that "I think that's neither here nor [there] because they didn't do that.   They immediately arrested him and you have to judge probable cause at the time of the arrest."   Tr. at 116:16-24 (Coberly).   The Court asked, given that during an inventory search, officers are permitted to search inside the trunk, whether there is a distinction with the middle console of the Suburban, which appeared as if it is easily removable and designed to be so removed.   See Tr. at 117:5-13 (Court).   Aranda-Diaz responded that "I think it would be analogous to going into the trunk to do an inventory search and maybe removing some side panels in the trunk that really isn't -- no one typically stores belongings in there."   Tr. at 117:14-20 (Coberly).   The Court asked whether the center console is designed to be removed for easy clean up if, for instance, a person inside the car spilled a drink. See Tr. at 117:21-118:1 (Court).   Aranda-Diaz responded that he does not know the design behind the removable center console, but is arguing that an inventory search, like any search, is "limited in scope by its purpose and the purpose is to protect the police . . . and protect the owners from allegations of theft."   Tr. at 118:2-7 (Coberly).   The Court responded that it agrees searches are limited in scope by their purposes, but inquired what the purpose would be behind limiting an inventory search if it is to protect from allegations of losing an item anywhere in the vehicle.   See Tr. at 118:8-10 (Court). Aranda-Diaz answered that he believes the case law limits inventory searches to their

administrative purposes and precludes searches in which officers are "rummaging in order to discovery incriminating evidence," which he asserted is what occurred here.   Tr. at 118:23-119:9 (Coberly).   Aranda-Diaz asserted that the facts clearly show the purpose of this search was to search for incriminating evidence, not to assess inventory, and stated:

> [T]he way I read the case law is clear . . .   [T]o go beyond looking for evidence in a trunk or in containers or in a glove compartment, once you start poking holes in seats or removing elements like speaker systems or consoles you need to have independent probable cause that drugs would be stored there.   And my argument is in this case that did not exist.
>
> So for those reasons I would ask, first, that the Court find that the arrest was not supported by probable cause, and as a result all evidence recovered should be suppressed.   In the alternative I'm asking the Court to find that the search done subsequent to the arrest exceed the scope allow[ed] under any exception because of the [dismantling] and therefore to suppress the evidence' found within the for lack of a better word, secret compartment.

Tr. at 120:19-121:1 (Coberly).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."   U.S. Const. amend IV.   For Fourth Amendment purposes, the Supreme Court has identified three categories of police-citizen encounters: (i) consensual encounters, which are not considered "seizures" within the meaning of the Fourth Amendment, and therefore suspicion of criminal wrongdoing need not support the consensual encounters; (ii) investigative stops, in which an officer may briefly detain a person based on reasonable suspicion of criminal activity; and (iii) arrests, which are justified only if the officer has probable cause to believe that the subject has committed a crime.   See, e.g., Florida v. Bostick, 501 U.S. 429, 434-36 (1991); Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir.

2000)(citing <u>Florida v. Royer</u>, 460 U.S. 491, 497-98 (1983)).

  **1.**    <u>**Investigative Detentions and Reasonable Suspicion.**</u>

   An encounter that is not consensual may nevertheless be constitutional as an investigative detention.   An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."   <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972)).   Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."   <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)).   Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, <u>Terry v. Ohio</u>, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," <u>United States v. Holt</u>, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc).

   "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop."   <u>United States v. Winder</u>, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting <u>United States v. Vercher</u>, 358 F.3d 1257, 1261 (10th Cir. 2004)).   This standard is met by information "falling 'considerably short' of a preponderance standard."   <u>United States v. Winder</u>, 557 F.3d at 1134. A police/citizen encounter that goes beyond the limits of a stop under <u>Terry v. Ohio</u> is an arrest which probable cause or consent must support to be valid.   <u>See United States v. Perdue</u>, 8 F.3d

1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."   <u>Terry v. Ohio</u>, 392 U.S. at 27.   "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."   <u>Terry v. Ohio</u>, 392 U.S. at 27.   A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." <u>Terry v. Ohio</u>, 392 U.S. at 29.   In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.   <u>See</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 436 (1991).

These stop-and-frisk principles apply with equal weight to motorists and to pedestrians. <u>See</u> <u>Michigan v. Long</u>, 463 U.S. 1032, 1050-51 (1983).   The Tenth Circuit has adopted the doctrine in <u>Terry v. Ohio</u> for an investigative detention -- "stop" --   and for a protective search -- "frisk."

> <u>Terry</u> has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

<u>United States v. King</u>, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted).   The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.   <u>United States v. King</u>, 990 F.2d at 1557.

- 28 -

In <u>United States v. Johnson</u>, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior.   <u>See</u> 364 F.3d at 1194.   The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  <u>See</u> <u>United States v. Johnson</u>, 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").   While many of the factors that the Tenth Circuit considered did not, without more, give rise to reasonable suspicion, the combination of circumstances was sufficient.   <u>See</u> <u>United States v. Johnson</u>, 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In <u>United States v. Ceballos</u>, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.   <u>See</u> 355 F. App'x at 227-28.   A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead and the girl continued on her walk.   <u>See</u> 355 at 228.   Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.   <u>See</u> 355 F. App'x at 228.   The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.   <u>See</u> 355 F. App'x at 228.   Not investigating any particular crime or suspected-crime, and admittedly

acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.

355 F. App'x at 228.   Upon talking to Ceballos, the officer discovered that Ceballos' breath

smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his

vehicle.   See 355 F. App'x at 228.   The Tenth Circuit found that the facts available to the officer

would have led a reasonable officer to conclude that reasonable suspicion existed, and that the

officer's "subjective characterization of his actions is irrelevant."   355 F. App'x at 229.   The

Tenth Circuit explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.   Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.   She refused, telling him she lived up the street.   Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.   He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.   Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.   The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 228-30.   The Tenth Circuit did not require the officer to identify the particular

crime of which he she had reasonable suspicion or even to acknowledge that he had reasonable

suspicion.   The Tenth Circuit was content to find that a reasonable officer would have reasonable

suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."   355 F. App'x at

- 30 -

229.   The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur.   See 355 F. App'x at 229.

     **2.**     **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest.   An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."   Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).   The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.   United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).   See Florida v. Royer, 460 U.S. 491, 499 (1983).   The use of handcuffs, however, does not always elevate a detention into an arrest.   See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest."). Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, probable cause must support the arrest.   See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'")(quoting Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir.2000), aff'd, 11-2231, 2013 WL 923192 (10th Cir. Mar. 12, 2013).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being

committed.'"   United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).   Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."   United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).   The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.   See Beck v. Ohio, 379 U.S. 89, 96 (1964).   "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."   United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).   Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

The Supreme Court has directed that, in analyzing whether information received from an informant establishes probable cause, courts must look to the totality of the circumstances, and

"make a practical, common-sense decision whether, given all the circumstances," including the informant's "'veracity' and basis of knowledge,'" there is a "substantial basis" for determining "a fair probability that contraband or evidence of a crime will be found in a particular place."   Illinois v. Gates, 462 U.S. at 239 (citations omitted).   The Tenth Circuit has recognized that the probable-cause determination using the totality of the circumstances test balances indicia of reliability and that, when there is sufficient independent evidence of corroboration, the informant's veracity need not be established:

> The Court explained that an informant's "veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." However, "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Specifically, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant."

United States v. Artez, 389 F.3d at 1111 (internal citations omitted).   Thus, the Court has recognized that, "[i]n testing the sufficiency of probable cause, courts may look at information received from a CI so long as other matters contained in the warrant corroborate the informant's statement."   United States v. Quezada-Enriquez, CR 06 2262 JB, 2007 WL 709047, at *5 (D.N.M. Feb. 5, 2007)(Browning, J), aff'd, 567 F.3d 1228 (10th Cir. 2009).   See United States v. Hager, 969 F.2d 883, 887 (10th Cir. 1992)(holding probable cause existed where independent investigation corroborated informant's report).   "Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct, because an informant who is right about some details is probably also right about others."   United States v. Lundy, 164 F. App'x 332, 334 (4th Cir. 2006)(internal quotations omitted).   See United States v. Gary, 24 F. App'x 862, 864-65 (10th Cir. 2001)(finding probable cause existed where an

independent investigation corroborated the "innocent information" an informant provided); 79 C.J.S. § 67, Searches and Seizures (stating that an informant's information may establish probable cause where it is corroborated by independent police work, an additional informant, or other personal knowledge of an officer; "[e]ven corroboration of portions of the information which do not in and of themselves involve criminal activity may be sufficient").

The Tenth Circuit has held that "[a] tip from an anonymous or confidential informant that narcotics are being distributed at a particular location may be corroborated through the arrangement of a controlled purchase at the suspect location." United States v. Artez, 389 F.3d at 1111. The Tenth Circuit has noted:

> The common formalities observed by police officers when conducting such controlled purchases are as follows: the police search the informant (and his vehicle, if appropriate) for money and contraband prior to the buy; give the informant money with which to purchase the narcotics; transport the informant to the suspect residence (or follow the informant to the residence); watch the informant enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence; search the informant upon exiting the suspect residence; and receive the narcotics from the informant.

United States v. Artez, 389 F.3d at 1111-12 (internal footnote omitted). "[T]he absence of constant visual contact with the informant conducting the transaction does not render a controlled purchase insufficient, nor does the absence of an audio-recording of the transaction." 389 F.3d at 1112.

In United States v. Richardson, 86 F.3d 1537 (10th Cir. 1996)(cited with approval in United States v. Artez, 389 F.3d at 1112), abrogation on other grounds recognized by United States v. Pearce, 146 F.3d 771, 774 (10th Cir. 1998), the Tenth Circuit held that probable cause existed based on a controlled purchase in which the officers had not before used the unwitting informant, Stone, and did not see the defendant, Richardson, provide the drugs to Stone, which the CI then

- 34 -

provided to the officers once the CI left Stone's presence.   See 86 F.3d at 1545.   The CI, who had

"numerous prior cocaine transactions with Mr. Richardson and Mr. Stone," called the police

officers and told them "that he could arrange a large cocaine transaction involving Mr. Richardson

and Mr. Stone."   86 F.3d at 1545.   The officer in charge verified the participants' identities and

then coordinated a controlled purchase, which progressed as follows:

> After Officer Cash verified the alleged participants' identities, a meeting was
> arranged. Officer Cash observed the informant enter Mr. Stone's vehicle to make a
> cocaine purchase. The informant returned from Mr. Stone's vehicle and informed
> Officer Cash that he had given Mr. Stone cash and that Mr. Stone was going to Mr.
> Richardson's residence to acquire the cocaine. Other officers observed Mr. Stone
> enter the driveway of Mr. Richardson's residence, exit his vehicle, disappear from
> sight for twenty minutes, return to his vehicle and depart. Officer Cash then
> observed Mr. Stone's return from Mr. Richardson's residence. The informant again
> entered Mr. Stone's vehicle and returned with cocaine.

86 F.3d at 1545.   The Tenth Circuit concluded that these facts provided sufficient probable cause

to search Richardson's home, because the informant's tip to officers that Mr. Stone could obtain

drugs from the defendant "was corroborated by a controlled narcotics purchase and the

observation of [the defendant's] residence."   86 F.3d at 1545.

### 3.     The Automobile Exception to Probable Cause for a Search.

"Under the automobile exception to the Fourth Amendment's warrant requirement, 'police

officers who have probable cause to believe there is contraband inside an automobile that has been

stopped on the road may search it without obtaining a warrant.'" United States v. Vazquez, 555

F.3d 923, 930 (10th Cir. 2009)(quoting Florida v. Meyers, 466 U.S. 380, 381 (1984)).

"Moreover, '[o]nce the officer[s'] suspicions rise to the level of probable cause, they are

empowered to search the entire vehicle, including the trunk and all containers therein that might

contain contraband.'"   United States v. Vazquez, 555 F.3d at 930 (quoting United States v.

Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008)).   "Probable cause to search an automobile exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"   United States v. Montes-Ramos, 347 F. App'x 383, 395-96 (10th Cir. 2009)(unpublished)(quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).   Courts must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."   United States v. Ledesma, 447 F.3d 1307, 1316 (10th Cir. 2006)(citations omitted).   "The ultimate question is whether the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."   United States v. Ledesma, 447 F.3d at 1316 (internal quotation marks and citations omitted).

The extent to which a search's scope is permissible can expand if probable cause develops during performance of an otherwise lawful automobile search.   See United States v. Carbajal-Iriarte, 586 F.3d 795, 802 (10th Cir. 2009)(holding that, even if a defendant's consent did not authorize an officer to "cut open his spare tire, the search [is] nonetheless permissible [if] the officers obtained probable cause to search the tire during the portion of the search to which the defendant did consent").   In United States v. Carbajal-Iriarte, for example, the Tenth Circuit found that the district court did not err in refusing to suppress drugs recovered from the seat of a vehicle after officers cut open the upholstery.   See 596 F.3d at 802.   The defendant argued that the officers exceeded the scope of his consent when they cut open the upholstery of the seat. See 596 F.3d at 802.   The Tenth Circuit stated:

> Here, the officers had an independent legal basis upon which to proceed because the dog's positive alert to the presence of drugs in the van provided probable cause. See United States v. Ludwig, 10 F.3d 1523, 1527-28 (10th Cir. 1993). As a result, it is immaterial whether Carbajal-Iriarte consented to cutting open the seat. Once the officers had probable cause to search the seat, his consent was no longer necessary.

586 F.3d at 802. See United States v. Morales-Zamora, 914 F.2d 200, 205-06 (10th Cir. 1990) (finding that it need not "reach the issue of consent because probable cause to search was supplied when the dog alerted to the vehicles" and stating that, under the "vehicle exception to the general rule that searches are reasonable only if conducted pursuant to a valid search warrant," no warrant was necessary for the search of the vehicles to be reasonable under the Fourth Amendment).

**4.      Vehicle Search Incident to Arrest.**

The Supreme Court in 2009 articulated two circumstances that permit police officers to search an arrestee's vehicle incident to arrest. First, a vehicle search incident to arrest that is motivated by concerns for officer safety is justified only "if the arrestee is within reaching distance of the passenger compartment at the time of the search." Arizona v. Gant, 556 U.S. at 351. Second, "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Arizona v. Gant, 556 U.S. at 343. Where the search is based on reasonable belief that evidence relevant to the crime might be found within the vehicle, "the suspect need not be within reach of the passenger compartment because 'the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein,' rather than a concern for officer safety." United States v. Aranda-Diaz, No. CR 08-2344 JB, 2009 WL 1563419, at *17 (D.N.M. May 31, 2009)(Browning, J.)(quoting Arizona v. Gant, 556 U.S. at 344). Although "a search incident to an arrest does not necessarily give police officers license to

dismantle a vehicle in search of contraband," the Court has pointed out that "'probable cause to believe a vehicle contains evidence of a criminal activity . . . authorizes a search of any area of the vehicle in which the evidence might be found.'"   United States v. Aranda-Diaz, 2009 WL 1563419, at *18 (quoting Arizona v. Gant, 556 U.S. at 347).

The Tenth Circuit has held that a vehicle search performed on a defendant's vehicle after police officers had arrested the defendant and found crack cocaine on his person, and after the vehicle was taken back to the police station, was permissible based on reasonable suspicion that evidence of the crime might be found in the vehicle.   See United States v. Polly, 630 F.3d 991, 999 (10th Cir. 2011).   The officers in United States v. Polly pulled over the defendant after they watched him attempt to turn into an automobile garage that they were observing based on suspicion of drug-trafficking activity and recognized him from a previous controlled purchase bust.   See 630 F.3d at 995.   When the defendant gave the officers permission to perform a pat-down search of his person, the officers found individual baggies which "appeared to contain crack cocaine" and $992.00 in cash.   630 F.3d at 995.   The officers arrested him, and because residents of the high-crime area began coming out of their homes and questioning the officers about the traffic stop, the officers drove the vehicle back to the police station to search the vehicle. See 630 F.3d at 995.   "Back at the station, officers searched the vehicle and found a receipt for a U–Haul storage unit, keys for a U–Haul lock, digital scales, razor blades, latex gloves, and a shaving bag containing crack cocaine and cocaine powder."   630 F.3d at 995-96.   When the defendant moved to suppress the evidence obtained in the vehicle by arguing that the search was illegal, the Tenth Circuit held that the district court properly held that, while the search could not

be justified based on officer safety, "the search was justified instead by the vehicle exception to the

warrant requirement."   630 F.3d at 999.   The Tenth Circuit reasoned:

> Here, we have little trouble concluding that, after the search of Polly, probable
> cause existed that justified an evidentiary search of the vehicle.   In addition to the
> facts that Polly had already sold drugs to undercover agents as part of a controlled
> buy and had appeared to flee upon seeing the police at the garage, the police had
> just searched his person and found a substantial amount of crack cocaine on him
> after he exited the vehicle.   These factors are sufficient to establish probable cause
> that the truck contained illegal drugs

630 F.3d at 999.

Three weeks after the Supreme Court decided Arizona v. Gant in 2009, the Court denied

Aranda-Diaz' motion to suppress a police search of his SUV in an unrelated case, in which officers

found cocaine in the cup holder and inside the driver's-side door panel, because the Court

concluded that "the search of the vehicle was based on probable cause and was a properly

conducted search incident to a lawful arrest."   United States v. Aranda-Diaz, 2009 WL 1563419,

at *17.   In United States v. Aranda-Diaz, an APD detective working undercover observed three

vehicles parked close together in an unlit portion of a parking lot.   See 2009 WL 1563419, at

**1-2.   The detective observed Aranda-Diaz exit one of the vehicles, an SUV, "run back and forth

between the vehicles in the parking lot several times exchanging items with the people in the other

vehicles," and "reach into a sock and retrieve an item from the sock."   2009 WL 1563419, at *2.

When Aranda-Diaz got back in his SUV and left the parking lot, the undercover detective followed

Aranda-Diaz, saw him run a red light, and radioed another officer -- who was not undercover -- to

effect a traffic stop of Aranda-Diaz' SUV.   See 2009 WL 1563419, at *2-3.   The second

detective arrived and drove behind Aranda-Diaz' SUV, and engaged the police cruiser's

emergency lights and siren.   Rather than pulling over immediately, "the SUV kept driving slowly

and swerving side to side," and during the two blocks before coming to a stop, the detectives "observed Aranda-Diaz inside the SUV fumbling with something while driving the SUV."   2009 WL 1563419, at *3.   When Aranda-Diaz stopped and pulled over his SUV, and the undercover detective walked up to the SUV, the detective saw a white powdery substance on the front of Aranda-Diaz' chest and mouth, which the detective believed to be crack cocaine.   See 2009 WL 1563419, at *3.   The detective removed a piece of the white substance, field tested the substance, and upon testing positive for the presence of cocaine, the detective arrested Aranda-Diaz.   See 2009 WL 1563419, at *4.   The detectives determined that they would have to tow the SUV, and performed an inventory search of the SUV before towing it.   See 2009 WL 1563419, at *4.   The Court found that the detectives "did not expect to find a large quantity of narcotics in the vehicle, because [they] believed at the time that Aranda-Diaz had probably swallowed much of the drugs he might have had in the car with him."   2009 WL 1563419, at *4.   Nevertheless, the detectives searched the SUV and found more of the white substance on the driver's seat and in the cup holder adjacent to the driver's seat.   A third detective arrived on the scene and assisted the officers in the SUV's search.   The third officer, using a flashlight, "observed that the driver's side power-window switch in the SUV was loose and was hanging to the side of the arm rest."   2009 WL 1563419, at *4.   Looking down into the hole next to the window switch, the third detective observed a golf-ball size bag of a white substance and a firearm inside the driver's-side door panel, removed the bag and the firearm, and the tested the bag, which tested positive for cocaine.   See 2009 WL 1563419, at *4.

The Court concluded that the officers had probable cause to believe that a search of the SUV might reveal evidence of the crime, reasoning: "While the arrest was based on the substance

. . . removed from Aranda–Diaz' chest testing positive for cocaine, the rest of the facts surrounding Aranda–Diaz' encounter with law enforcement also provided . . . [the] officers with reason to believe there was drug evidence in the SUV."   United States v. Aranda-Diaz, 2009 WL 1563419, at *16.   The Court noted that, although the police officers conducted the search for inventory purposes, "a lengthy discussion of the inventory search exception to the warrant requirement is unnecessary because the search of the vehicle was based on probable cause and was a properly conducted search incident to a lawful arrest."   2009 WL 1563419, at *18.   Aranda-Diaz argued, however, that the search's scope was unreasonable, contending that, "even if the search of the vehicle was otherwise lawful, the officers violated the Fourth Amendment by dismantling the door to recover the bag containing more drugs and the firearm."   2009 WL 1563419, at *17.   The Court noted that "it was not the officers who removed the lock from its place," as "the switch was already loose and the officers were able to see the bag without dismantling the door."   2009 WL 1563419, at *17.   The Court concluded that, because the detective "had observed Aranda-Diaz engage in an array of activities that tended to raise suspicions of drug trafficking," the third detective who searched the door panel "had the basis for a reasonable belief that he would find evidence of the drug trafficking, which was the crime of arrest."   2009 WL 1563419, at *17.   The Court thus found that the detective "was therefore justified in searching the interior of the car, including the hole near the loose switch, which was visible, and in which the bag containing contraband could be seen with the aid of a flashlight."   2009 WL 1563419, at *17.

## 5.   **Inventory Searches**.

An inventory search undertaken pursuant to impoundment or the authority to impound "constitutes a well-defined exception to the warrant requirement."   Illinois v. Lafayette, 462 U.S.

640, 643 (1983).   See South Dakota v. Opperman, 428 U.S. 364, 372 (1976).   Discussing the

relationship between probable cause and inventory searches in its opinion in United States v.

Griffin, 729 F.2d 475 (7th Cir. 1984), the United States Court of Appeals for the Seventh Circuit

stated:

> In applying the reasonableness standard adopted by the Framers, [the] Court has
> consistently sustained police intrusions into automobiles impounded or otherwise
> in lawful police custody where the process is aimed at securing or protecting the car
> and its contents.   Thus, the justification for an inventory search does not rest on
> probable cause and the absence of a warrant is immaterial to the reasonableness of
> the search.

729 F.2d at 481 (citations omitted)(internal quotation marks omitted)(quoting Illinois v. Lafayette,

462 U.S. at 643).   "The policies behind the warrant requirement are not implicated in an inventory

search."   Colorado v. Bertine, 479 U.S. 367, 371 (1987)(citing South Dakota v. Opperman, 428

U.S. at 370 n.5).   Inventory searches developed in response to three needs: (i) the need to protect

the owner's property while it remains in police custody; (ii) the need to protect the police against

claims or disputes over lost, stolen, or vandalized property; and (iii) the need to protect the police

from danger.   See South Dakota v. Opperman, 428 U.S. at 369.   Inventory searches are allowed

to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.

See Florida v. Wells, 495 U.S. 1, 2 (1990)(citing South Dakota v. Opperman, 428 U.S. at 369).

   A warrantless inventory search is proper when the search is conducted pursuant to standard

police procedures for the purpose of protecting the car and its contents.   See United States v.

Maraga, 76 223, 228 (10th Cir. 2003)(unpublished)("An impoundment must either be supported

by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely

unrelated to an ongoing criminal investigation."); United States v. Lugo, 978 F.2d 631, 636 (10th

Cir. 1992)("When the police acquire temporary custody of a vehicle, a warrantless inventory

search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'")(quoting South Dakota v. Opperman, 428 U.S. at 372).   "The policy or practice governing inventory searches should be designed to produce an inventory."   Florida v. Wells, 495 U.S. at 4 (citing Colorado v. Bertine, 479 U.S. at 376).   "[I]n forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion."   Florida v. Wells, 495 U.S. at 4.   A court can consider an officer's testimony regarding the procedures and the purpose of the search as evidence. See United States v. Lugo, 978 F.2d at 637.   A written policy concerning inventory searches is not necessary; an oral policy is sufficient to meet the standard procedure test that the Tenth Circuit articulated in United States v. Lugo.   See Molina v. Spanos, 208 F.3d 226, 1999 WL 626126, at *9 (10th Cir. 1999)(unpublished table decision); United States v. Jacquez, 409 F.Supp.2d 1286, 1298 (D.N.M. 2005)(Browning, J.)("Although there may not be a written policy concerning inventory searches, including inventory searches of unlocked containers, an oral policy is sufficient to meet the standard procedure test articulated in United States v. Lugo.").

If an inventory search is conducted pursuant to department policy, to find the inventory search unconstitutional, the officers must have acted out of bad faith or for the sole purpose of investigation.   See Colorado v. Bertine, 479 U.S. at 371 ("[T]here was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation."); United States v. Moraga, 76 F. App'x 223, 228 (10th Cir. 2003)("Inventory searches must be conducted according to standardized procedures, and the police must act in good faith and cannot search for the sole purpose of investigation.").   Inventory searches, however,

"must not be a ruse for a general rummaging in order to discover incriminating evidence."   United

States v. Martinez, 512 F.3d 1268, 1274 (10th Cir. 2008)(quoting Florida v. Wells, 495 U.S. at

4)(internal quotation marks omitted).   If a police officer performs an inventory search of a vehicle

before ultimately deciding not to have it towed, a court must determine "whether at the time of the

inventory search [the officer] reasonably believed that the car would be towed."   United States v.

Henderson, 61 F.3d 906, 1995 WL 431397, at *3 (7th Cir. 1995)(before Posner, C.J., Cummings,

J., and Ripple, J.)(unpublished table decision).

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's constitutional rights, the police will be

prohibited from using that evidence in a criminal prosecution of that person.   See United States v.

Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth

Amendment cannot be used in a criminal proceeding against the victim of the illegal search and

seizure.")(citations omitted); McDonald v. United States, 335 U.S. 451, 453 (1948).   For the

exclusionary rule to apply, the defendant needs to show, by a preponderance of the evidence, a

constitutional violation, and a causal nexus between the violation and the evidence sought to be

excluded.   See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).   Once the

defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the

burden shifts to the prosecution to establish that some exception to the exclusionary rule applies.

See United States v. Torres-Castro, 470 F.3d at 999.

## LAW REGARDING THE COLLECTIVE-KNOWLEDGE DOCTRINE

"Under the collective-knowledge doctrine -- also called the 'fellow officer rule' -- the

knowledge of one officer supporting a search or seizure may be imputed to other law enforcement

officers acting in conjunction with the knowledgeable officer."   James v. Chavez, 830 F. Supp. 2d 1208, 1260 (D.N.M. 2011)(Browning, J.)(citing United States v. Hensley, 469 U.S. 221, 232-33 (1985); United States v. Wilkinson, 633 F.3d 938, 941 (10th Cir. 2008)).   The collective-knowledge doctrine stems from United States v. Hensley, in which the Supreme Court held that evidence uncovered in the police officers' stop of a defendant based on a notice that another state issued about the defendant's outstanding warrant was admissible, stating that "the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying the stop."   469 U.S. at 223.   There are two categories under which the collective-knowledge doctrine imputes knowledge among officers: "'horizontal' collective knowledge and 'vertical' collective knowledge."   United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008).

"The first category subsumes situations where a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause."   United States v. Chavez, 534 F.3d at 1345 (citing United States v. Shareef, 100 F.3d 1491, 1503-05 (10th Cir. 1996)).   In these situations, a court "must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold."   United States v. Chavez, 534 F.3d at 1345 (citations omitted); United States v. Christy, 810 F. Supp. 2d 1219, 1261 (D.N.M. 2011)(Browning, J.).   The second category subsumes situations "where one officer has probable cause and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action."   United States v. Chavez, 534 F.3d at 1345 (emphasis in original).   In these situations, the relevant inquiry is whether the officer

who requested that the other law enforcement officer to conduct a search or make a seizure had a sufficient legal basis to make the request.   See United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008)("When law enforcement officials rely on a bulletin or alert to conduct a stop or make an arrest, the relevant inquiry is whether the officer who issued the alert -- rather than the officer who conducted the challenged action -- had the requisite level of suspicion."). The first and second categories are not mutually exclusive; for example, "the officer who has probable cause may possess that information as a result of communication from other officers." United States v. Chavez, 534 F.3d at 1345 n.12.

While the collective-knowledge doctrine is most commonly applied to impute reasonable suspicion or probable cause to other officers, see, e.g., United States v. Chavez, 534 F.3d at 1345-46, several courts and judges have stated or suggested that it also can be used to impute knowledge of exigent circumstances, see, e.g., United States v. Russell, 436 F.3d 1086, 1094-95 (9th Cir. 2006)(Thomas, J., concurring in part and dissenting in part)("We analyze the 'reasonable grounds to believe that there is an emergency at hand,' on an objective basis, taking into consideration the collective knowledge of the officers at the time." (citing United States v. Sutton, 794 F.2d 1415, 1426 (9th Cir. 1986))); Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003).   The Court has adopted this view and applies the collective-knowledge doctrine in its exigent circumstances analysis.   See James v. Chavez, 830 F. Supp. 2d at 1261 ("The Court will take into account this collective-knowledge rule in its exigent circumstances analysis."); United States v. Christy, 810 F. Supp. 2d at 1262 ("The Court will apply the collective-knowledge doctrine in its determination whether exigent circumstances existed and whether there was sufficient probable cause to obtain a warrant.").

## ANALYSIS

The Court will deny Aranda-Diaz' Motion to Suppress.  The CI's information and the circumstances of the controlled purchase, including Ficke's observations of Lopez and one other person enter Aranda-Diaz' Suburban and exit only a few moments later, provided probable cause for Aranda-Diaz' immediate arrest.  The subsequent search of the Suburban was lawful as a search incident to arrest, because Aranda-Diaz' arrest based on distribution to Lopez provided the officers reasonable belief that evidence relevant to the crime of arrest might be found in the vehicle.  Moreover, the circumstances surrounding Aranda-Diaz' arrest for heroin distribution provided the officers with probable cause to believe that the Suburban contained evidence relevant to the distribution crime, and the officer who searched the suburban believed the center console might contain this evidence.  The search of the area under the Suburban's center console was therefore lawful.

## I.    THERE WAS SUFFICIENT REASONABLE SUSPICION AND PROBABLE CAUSE TO JUSTIFY ARANDA-DIAZ' DETENTION AND ARREST.

Law enforcement had both reasonable suspicion and probable cause to detain and arrest Aranda-Diaz.  Aranda-Diaz conceded at the hearing that the police officers had reasonable suspicion to detain him.  See Tr. at 101:8-10 (Court, Coberly).  The CI tipped Martinez that he/she knew an individual by the name of Jessie who could help him buy heroin from an individual by the name of "Oso," later identified as Aranda-Diaz.   An undercover controlled purchase from Aranda-Diaz through Jessie -- later identified as Lopez -- corroborated the CI's tip that Aranda-Diaz was distributing drugs.  The Court thus concludes that probable cause supported Aranda-Diaz' arrest immediately after the CI and Lopez drove away from the transaction, and that the arrest was therefore lawful.

- 47 -

Aranda-Diaz concedes that "an informant's tip, when sufficiently corroborated by officers' investigations, can supply the necessary probable cause for an arrest."   Motion to Suppress at 5 (citing United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007).   He cites to the Tenth Circuit's decision in United States v. Artez for the proposition that the controlled purchase, because of the use of Lopez as an intermediary, did not corroborate the CI's tip that "Oso" -- Aranda-Diaz -- was a drug dealer and that the officers therefore did not have probable cause to arrest him.   He notes that the Tenth Circuit in United States v. Artez concluded that the controlled purchase provided the officers probable cause notwithstanding that the controlled purchased used an unwitting informant as an intermediary, but contends that United States v. Artez is distinguishable, because the officers had:

> (1) executed two controlled purchases and "field tested the substance to verify that it was, in fact, methamphetamine;" (2) learned that a previous anonymous tipster had complained of drug activity at the defendant's residence which corroborated drug activity; (3) conducted several surveillances of the defendant's residence which corroborated drug activity; and (4) learned that four other individuals with criminal histories involving drugs either lived at or frequented the defendant's residence.

Motion to Dismiss at 7 (citing United States v. Artez, 389 F.3d at 1110, 1114-15).

The Tenth Circuit in United States v. Artez noted that "[a] tip from an anonymous or confidential informant that narcotics are being distributed at a particular location may be corroborated through the arrangement of a controlled purchase at the suspect location."   389 F.3d at 1111.[6] As Aranda-Diaz emphasizes, however, the Tenth Circuit in United States v. Artez

---

[6]   Although a distinction here may be that the controlled purchase was designed to purchase drugs from a particular person, rather than at a particular location, the Court does not find that distinction to matter for probable-cause purposes.   Just as the informant tipped police a person was dealing drugs at a location and the police monitored the purchase at that location in United States v. Artez, so here, the CI tipped police that Aranda-Diaz was a drug dealer, and when Lopez

pointed out that "[t]he use of an unwitting informant introduces an additional layer of uncertainty to the transaction because it leaves open the possibility that the narcotics were acquired not at the suspect residence but at the location where the confidential and unwitting informants met before and after the transaction."   389 F.3d at 1112.   Additionally, Aranda-Diaz correctly points out that the officers conducted two controlled purchases in United States v. Artez and that the officers tested the substance for methamphetamine before applying for the warrant.   The Tenth Circuit did not discuss either of these two factors in deciding that the controlled purchases in that case corroborated the CI's tip and provided the officers with probable cause.

Notwithstanding the unwitting informant's use as an intermediary, the Tenth Circuit held that the way in which the officers conducted the controlled purchases corroborated the CI's tip that the location was being used for narcotics distribution.   Importantly, nowhere in its decision did the Tenth Circuit consider as supporting corroboration that there were multiple controlled purchases; rather, the Tenth Circuit based its reasoning on the way in which the officers in United States v. Artez conducted the searches as corroborating the CI's tip: "[T]he authority supports our conclusion that the purchases conducted as Van Wagoner [the detective police officer] conducted these controlled purchases corroborate a confidential informant's tip that a particular location is being used to distribute narcotics."   389 F.3d at 1113.   In reaching this conclusion, the Tenth Circuit, citing its decision in United States v. Richardson, stated that "we have approved the use of an unwitting informant in a controlled purchase situation almost indistinguishable from the one at issue in this case," United States v. Artez, 389 F.3d at 1112, and noted that the controlled purchases "were conducted in a similar manner to the controlled purchases . . . [involved in] other

---

told the CI the transaction would take place at a particular location -- 5th Street and Menaul -- the police then monitored the controlled purchase from Aranda-Diaz at that suspect location.

cases that have approved the use of intervening unwitting informants," 389 F.3d at 1113 (citing United States v. Jordan, 999 F.2d 11, 12-14 (1st Cir. 1993); United States v. Blackwood, 913 F.2d 139, 141 (4th Cir. 1990)).   Notably, in United States v. Richardson, which the Tenth Circuit considered "almost indistinguishable" from United States v. Artez, the officers used only one controlled purchase.   See United States v. Richardson, 86 F.3d at 1542-43.   Accordingly, the Court concludes that the lack of multiple controlled purchases using Lopez does not detract from the controlled purchase's corroboration of the CI's tip that Aranda-Diaz distributed drugs.

As to the third point of distinction -- that the officers in United States v. Artez "conducted several surveillances of the defendant's residence which corroborated drug activity," Motion to Dismiss at 7 -- given that the operation here was designed to catch a person dealing drugs, rather than to investigate a residence out of which drugs were allegedly being dealt, the officers did not have the opportunity to set up surveillance.   Nevertheless, the Court concludes that surveillance here also corroborated the CI's tip to Martinez.   When the CI sent a text message to Martinez that the drug transaction would take place, and the officers positioned themselves to observe the transaction in that area, as soon as Aranda-Diaz parked his Suburban on 5th Street, before Lopez arrived to purchase drugs from Aranda-Diaz, the officers saw another car pull up behind Aranda-Diaz' Suburban, get into the Suburban, exit and return to his vehicle a few moments later, and leave.   See Tr. at 20:24-21:18 (Martinez, Walsh).   Sergeant Ficke believed that this was Aranda-Diaz selling drugs to the person from the unknown vehicle.   See Tr. at 21:4-6 ("[S]ergeant [Ficke said,] based on his training and experience he believed that another drug transaction was occurring.").   As in United States v. Artez, therefore, police surveillance corroborated the CI's tip.

In relation to Aranda-Diaz' second and fourth distinctions, that there were no other reported anonymous tips about him -- or "Oso" -- and that, in United States v. Artez, four other individuals who either lived at or frequented the residence had criminal convictions for narcotics-related offenses, neither of those factors are present here. The test for probable cause based on an informants tip is not, however, based on the absence or presence of listed elements. Rather, the Court must analyze the totality of the circumstances and "make a practical, common-sense decision whether, given all the circumstances," including the informant's "'veracity' and basis of knowledge,'" there is a "substantial basis" for determining "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. at 239 (citations omitted). And there are facts present here that were not present in either United States v. Artez or United States v. Richardson, in which controlled purchases sufficiently corroborated the CIs' tips.

First, whereas the Supreme Court has noted that "highly relevant" to probable cause based on an informant's tip is "the informant's credibility, and the reliability of his information, together the basis of [the informant's] knowledge," Illinois v. Gates, 462 U.S. at 230, 240 (internal quotes omitted), Martinez testified at the evidentiary hearing that he found the informant truthful and believable, and his information reliable, because he had used the CI on two successful controlled purchases before this controlled purchase. See Tr. at 12:13-13:12 (Walsh, Martinez). The informants in United States v. Artez and United States v. Richardson, on the other hand, appear not to have been used before the controlled purchases at issue in those cases. The Tenth Circuit in United States v. Artez did not note in the facts that the police had used the informant before the federal crime at issue, but only noted the officer's beliefs about the informant's knowledge and

reliability based on the one tip:

> Van Wagoner also indicated . . . that the CI was an admitted narcotics user and that the CI had given Van Wagoner some details about the pricing, packaging, and effects of methamphetamine, which convinced Van Wagoner that the CI was knowledgeable about such things. Van Wagoner stated . . . that he considered the CI to be reliable because the CI had never been in custody and came forward out of his or her concern for the safety of the community.

389 F.3d at 1110.   Similarly, in United States v. Richardson, it appears likely the police had never before used the informant, became the informant became an informant only after the police arrested him and he agreed, in exchange for dropping the charges against him, to assist the police department in setting up the controlled purchase that led to the defendant's arrest.   See 86 F.3d at 1242.   As the Supreme Court has provided that "a deficiency in one [factor] may be compensated for, in determining overall reliability of a tip, by a strong showing as to the other," although the record from the evidentiary hearing does not articulate the CI's knowledge base, that Martinez had used the CI here successfully in two controlled purchases which led to drug convictions on both of those instances, is thus an additional factor showing credibility and reliability, and overcomes any deficiency in showing the CI's basis of knowledge.

Additionally, even if one of these factors was lacking in this case -- credibility, reliability, or knowledge base -- the Court finds that the circumstances of the controlled purchase provided "some other indicia of reliability" which would "compensate[] for" any deficiency.   The defendant in United States v. Artez objected "that the money Van Wagoner gave the confidential informant was not marked," 389 F.3d at 1113, and the Tenth Circuit noted in a footnote that "[s]ome courts note that the money is marked, and some do not," 389 F.3d at 1111-12 n.3 (internal citations omitted).   Here, Martinez photocopied the buy money before he provided it to the CI. While the evidence as it stands shows that the officers found the buy money on Aranda-Diaz after

they had already arrested him, that the CI knows that procedure is in place and continues to

participate in the controlled purchase supports finding the tip credible and truthful.   Finally, the

Tenth Circuit's footnote four in United States v. Artez counsels in favor of concluding that

controlled purchase was sufficient.   The Tenth Circuit in United States v. Artez's footnote four

concluded that the distinction between the unwitting informant's transaction taking place in a

house, where presumably persons other than the defendant could have supplied the drugs, and the

transaction taking place in a vehicle, where there is less opportunity for the drugs to come from

other sources, was not "relevant" whether controlled purchase sufficiently corroborated the tip,

reasoning:

> There is no indication in Richardson that, because the meeting occurred in a vehicle
> instead of a house, the officers were able to observe the meeting. Accordingly, just
> as in this case, the manner in which the controlled purchase was conducted in
> Richardson left open the possibility that the narcotics transaction occurred during
> the meeting between the informants, not at the suspect residence. Nonetheless, we
> held in Richardson that the controlled purchase sufficiently corroborated the
> informant's tip.

United States v. Artez, 389 F.3d at 1113 (internal citations omitted).   Thus, in light of United

States v. Artez and United States v. Richardson, the controlled purchase corroborated the CI's tip

that Aranda-Diaz would distribute drugs to him through Lopez, and provided a totality of

circumstances which would "warrant a man of reasonable caution in the belief that an offense has

been or is being committed.'"   United States v. Valenzuela, 365 F.3d at 896-97 (quoting United

States v. Edwards, 242 F.3d at 934).   The Court concludes therefore that, "given all the

circumstances . . . , including the veracity and basis of knowledge of persons supplying hearsay

information," Illinois v. Gates, 462 U.S. at 238, given the two successful previous controlled

purchases using the same CI that Martinez used in this case, and given the controlled purchase that

the officers witnessed, the officers had probable cause to arrest Aranda-Diaz for heroin distribution when they did so immediately after the CI and Lopez left.

## II. THE OFFICERS' SEARCH OF THE SUBURBAN, INCLUDING THE SEARCH OF THE CENTER CONSOLE, WAS LAWFUL AS A SEARCH INCIDENT TO ARREST, BECAUSE THE OFFICERS HAD PROBABLE CAUSE TO BELIEVE THAT THE SUBURBAN CONTAINED EVIDENCE OF THE OFFENSE OF ARREST.

The last time that Aranda-Diaz was before the Court, in 2009, the Court noted: "The Supreme Court has held that 'circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'"   United States v. Aranda-Diaz, 2009 WL 1563419, at *16 (quoting Arizona v. Gant, 556 U.S. at 351).   In that case, like this one, the APD officers arrested Aranda-Diaz for a drug-related offense -- drug possession -- and also like this case, Aranda-Diaz was driving an SUV.   See 2009 WL 1563419, at *2-4.   The Court in that case concluded that his arrest for drug possession and "the facts surrounding Aranda-Diaz' encounter with law enforcement also provided . . . [the] officers with reason to believe there was drug evidence in the SUV."   United States v. Aranda-Diaz, 2009 WL 1563419, at *16.   The Court concludes that there is no sound basis on which to distinguish the search incident to arrest in Aranda-Diaz' 2009 case, which the Court found lawful, and the search incident to Aranda-Diaz' drug-related arrest for distribution here.   Accordingly, the Court concludes that the search of Aranda-Diaz' Suburban incident to his arrest was lawful.

Aranda-Diaz first asserts that the officers did not have reason to believe that the Suburban's search would provide evidence relevant to the distribution charge, contending: "Because officers did not have any evidence that 'Oso' was involved in drug trafficking beyond

the sale to 'Jessie,' officers could not reasonably believe that anything else relevant to that sale would be found in the Suburban."   Motion to Suppress at 9.   Aranda-Diaz' argument is not sound both generally and particularly in the context of this case.   Generally, it is reasonable for an officer to believe that a person who just sold from the person's vehicle an amount of heroin, which at a price of $750.00 was "far in excess of user amounts and were amounts typical of a mid-level drug dealer," Ex. A at 1, "might" have evidence "relevant to the crime of arrest" in that vehicle. Arizona v. Gant, 556 U.S. at 344 (internal quotations omitted)(quoting Thornton v. United States, 541 U.S. 615, 632 (Scalia, J., concurring in judgment)).   Particularly, when Ficke observed a car pull up behind Aranda-Diaz' Suburban just before Lopez purchased heroin from Aranda-Diaz, and observed that individual get into and out of Aranda-Diaz' Suburban, which Ficke believed to be another drug transaction, see Tr. at 20:24-21:18 (Martinez, Walsh), the officers had "evidence that 'Oso was involved in drug trafficking beyond the sale to 'Jessie'" and thus had a reasonable belief that there might be further evidence of heroin distribution in the Suburban, Motion to Suppress at 9.

Aranda-Diaz' second argument, that the officers exceeded the scope of any lawful vehicle search when they searched the center console under the cup holders, also does not find support in the law.   As Aranda-Diaz concedes, see Motion to Suppress at 9, the Supreme Court has held that, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," police can lawfully search "any area of the vehicle in which the evidence might be found."   Arizona v. Gant, 556 U.S. 347 (emphasis added)(citing United States v. Ross, 456 U.S. 798, 820-21 (1982)).   At the time that the officers searched Aranda-Diaz' Suburban, the CI's tip, which the controlled purchase corroborated, provided the officers probable cause to arrest Aranda-Diaz for distribution.

The APD officers watched the transaction as it occurred, just before blocking Aranda-Diaz'

getaway, and arrested Aranda-Diaz as he was leaving the transaction.   Watching that transaction

take place just as the CI described to Martinez would provide a reasonable officer with information

sufficient for that officer to form a belief that there was probable cause to believe Aranda-Diaz'

Suburban contained evidence of the criminal activity.   See United States v. Valenzuela, 365 F.3d

at 896-97 (defining "[p]robable cause to arrest" as "'facts and circumstances within the officers'

knowledge, and of which they have reasonably trustworthy information, which are sufficient in

themselves to warrant a man of reasonable caution in the belief that an offense has been or is being

committed'")(quoting United States v. Edwards, 242 F.3d at 934).   Cf. Olsen v. Layton Hills

Mall, 312 F.3d at 1312 (holding that the primary consideration in determining whether probable

cause for arrest existed is "whether a reasonable officer would have believed that probable cause

existed to arrest the defendant based on the information possessed by the arresting

officer.")(alterations and internal quotation marks omitted).   While the CI's tip and the controlled

purchase provided the officers "probable cause to believe a vehicle contains evidence of criminal

activity," Ficke's observation of the drug transaction immediately before the controlled purchase

with the CI and Lopez provided the officers with probable cause to believe the Suburban contained

evidence of the crime, and provided the officers sufficient justification to search the compartment

under the drink holders in the center console.   Arizona v. Gant, 556 U.S. 347 (citing United States

v. Ross, 456 U.S. at 820-21).

　　　　With probable cause to believe that the Suburban contained evidence relevant to the heroin

distribution crime, United States v. Ross and Arizona v. Gant provided the officers the lawful

ability to search any area of the vehicle in which evidence relevant to the crime might be found.

The officers' search of the center console cannot soundly be distinguished from the search of the door panel under the loose switch in Aranda-Diaz' 2009 criminal case before the Court.   In that case, he argued that "the hole from which the loose switch was hanging was not properly part of the search incident to arrest," and that, therefore, "even if the search of the vehicle was otherwise lawful, the officers violated the Fourth Amendment by dismantling the door to recover the bag containing more drugs and the firearm."   2009 WL 1563419, at *17.   The Court there concluded, however, that his arrest for drug possession provided the officers probable cause to believe the SUV contained evidence related to the crime of arrest, and that the officer was "therefore justified in searching the interior of the car, including the hole near the loose switch, which was visible, and in which the bag containing contraband could be seen with the aid of a flashlight."   2009 WL 1563419, at *17.   Just like the officer in that case noticed the "driver's side power-window switch in the SUV was loose and was hanging to the side of the arm rest," 2009 WL 1563419, at * 4, here, Stout, the officer who discovered the pill container and scale within the area under the center console during his search, testified at the evidentiary hearing that he noticed the cup holder was "loose."   Tr. at 71:1-2 (Stout).

Additionally, the center console, as opposed to the area inside the door panel under the window switch in Aranda-Diaz' 2009 case, would more likely contain evidence related to the drug distribution crime. While Arizona v. Gant requires only that officers believe "evidence might be found" in the particular area they search, 556 U.S. at 347, Stout testified that his experience in law enforcement provided him reason to believe that the area under the console particularly might contain evidence of the distribution, as he testified that "folks like to hide things in that area.   It's a natural area where there's a void, and in most vehicles the cup holders come out . . . ."   Tr. at

71:20-25 (Stout).   The Court therefore concludes that search-incident-to-arrest exception that the Court articulated in <u>Arizona v. Gant</u> justified the officers' search of Aranda-Diaz' Suburban, because they had reason to believe the Suburban might contain evidence of the distribution.   The Court further concludes that the circumstances surrounding Aranda-Diaz' arrest, including the officers' observation of the controlled purchase and the probable distribution immediately before the controlled purchase, provided the officers probable cause to believe that the Suburban contained evidence of criminal activity, and provided justification for the officers' search of the area under the Suburban's cup holders in the center console, and the vehicle search as a whole was lawful.   Accordingly, the Court will decline to apply the exclusionary rule to suppress any evidence recovered upon Aranda-Diaz' arrest, the search of his person or vehicle or any fruits thereof.

**IT IS ORDERED** that Defendant Yuren Aranda-Diaz's Motion to Suppress Evidence and Statements, filed May 24, 2013 (Doc. 37), is denied.   The Court will not exclude the evidence that the officers found on Defendant Yuren Aranda-Diaz' person when they searched his person, will not exclude evidence that the officers found when they searched his vehicle, and will not exclude any of his statements to law enforcement after his arrest as fruits of an unlawful search.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Kenneth J. Gonzales
    United States Attorney

David M. Walsh
Novaline Wilson
   Assistant United States Attorneys
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Todd A. Coberly
Coberly & Attrep, LLLP
Santa Fe, New Mexico

    *Attorneys for the Defendant*